In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1453

WENFANG LIU,

*Plaintiff-Appellant*,

*v.*

TIMOTHY MUND,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:09-cv-00500-wmc—**William M. Conley**, *Chief Judge*.

ARGUED JUNE 22, 2012—DECIDED JULY 12, 2012

Before POSNER, ROVNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. Timothy Mund, an American, married Wenfang Liu, a Chinese woman 19 years his junior, in China. Two years later the couple decided to move to the United States. For Liu to be admitted as a permanent resident on the basis of her marriage to an American, her husband had to sign an "I-864 affidavit," agreeing to support his wife at 125 percent of the poverty level (approximately $13,500 a year), even if

they divorced. They divorced two years later. Without relying on the affidavit, the divorce court (a Wisconsin court, because Wisconsin was where the couple lived) ordered Mund (so far as relates to this appeal) to support Liu for one year at a rate of $500 a month. But the court made the obligation of support contingent on her proving that despite actively seeking work by making at least four job applications a month, she had not found any work; she is a graduate of a Chinese college but her spoken English is very poor. This provision of the divorce decree was consistent with Wisconsin case law. The court declined to address the possible bearing of federal law, namely the I-864 affidavit.

Mund refused to provide the support specified in the federal affidavit, on the ground that his ex-wife wasn't looking for work. So she filed the present suit, in federal district court in Wisconsin, seeking that support and contending that failure to mitigate damages is not a defense to the support obligation created by the affidavit.

The Immigration and Nationality Act, 18 U.S.C. § 1183a(e), authorizes suit "in any appropriate court…by a sponsored alien" "to enforce an affidavit of support executed under" section 1183a(a); see also section 1183(a)(1)(C). The suit thus arises under federal law, making the federal district court an "appropriate court" in which to bring the suit. See *International Union of Operating Engineers, Local 150, AFL-CIO v. Ward*, 563 F.3d 276, 281 (7th Cir. 2009). There is no contention that the judgment in the divorce proceeding has a preclusive

effect in the present case. The right of support conferred by federal law exists apart from whatever rights Liu might or might not have under Wisconsin divorce law.

The district judge held that Liu was not entitled to support pursuant to the I-864 affidavit during the 160-day period after she had filed her motion for summary judgment, because she hadn't actively sought work during that period. The finding that she hadn't sought work is well supported; the only substantial issue presented by her appeal, and the only one we discuss, is whether in a suit to enforce the obligation of support created by the federal affidavit the plaintiff has a legal duty to mitigate damages.

Liu is pro se, Mund represented. We requested a lawyer to participate in the appeal as an amicus curiae to present Liu's position; Liu was unable to do so effectively as a pro se and refused to be represented by a court-recruited lawyer. The Justice Department's Office of Immigration Litigation has also filed an amicus curiae brief.

The Immigration and Nationality Act forbids admission to the United States of any alien who "is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A); see also *id.*, §§ 1601(2)(A), (5). This provision is implemented by requiring a person who sponsors an alien for admission to "execute an affidavit of support." 8 C.F.R. §§ 213a.2(a), (b); see also 8 U.S.C. § 1182(a)(4)(C)(ii). The affidavit, the contents of which are specified in 8 U.S.C. § 1183a, is in the form of a contract between the sponsor and the United States, 8 C.F.R. § 213a.2(d), called Form I-864. Public providers of benefits to indigents are designated as third-party beneficiaries of the affidavit-

contract and are expressly authorized by the Act to sue a sponsor who defaults on his support obligation. 8 U.S.C. § 1183a(a)(1)(B); see also § 1183a(b)(1)(A). So this is not a case like *Astra USA, Inc. v. Santa Clara County*, 131 S. Ct. 1342, 1347-48 (2011), in which the Supreme Court held that the beneficiary of a statute could not "cure" the statute's omission of a private right of action by suing as a third-party beneficiary. The statute in this case confers an express such right on third-party beneficiaries.

Recall that the obligation is to support the sponsored alien at 125 percent of the poverty income level; the affidavit must include this requirement. 8 U.S.C. § 1183a(a)(1)(A). The affidavit also, however, specifies several excusing conditions, such as the sponsor's death or the alien's being employed for 40 quarters (also specified as an excusing condition in the statute, 8 U.S.C. § 1183a(a)(3)(A)). But the list of excusing conditions does not mention the alien's failing to seek work or otherwise failing to mitigate his or her damages.

The private amicus curiae argues that there's no duty to mitigate, the Justice Department's Office of Immigration Litigation that there is. The statute and the affidavit are silent on the question. The statute and its implementing regulations assumed their present form in 1996. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 551, Pub. L. 104-208, 110 Stat. 3009-675. (The version of Form I-864 that Mund signed dates back to 2001.) Sponsors' affidavits had existed earlier—perhaps as early as 1930—but generally had not been understood to impose a legal duty on the sponsor to support the

sponsored person. See Robert A. Mautino, Comment, "Sponsor Liability for Alien Immigrants: The Affidavit of Support in Light of Recent Developments," 7 *San Diego L. Rev*. 314, 316 (1970). Given that 16 years have elapsed since the sponsor's support obligation became legally enforceable, we're surprised that there is virtually no case law interpreting either the obligation or possible defenses, such as a sponsored person's failure to mitigate damages.

The I-864 form requires the sponsor to "agree to provide the sponsored immigrant(s) whatever support is *necessary* to maintain the sponsored immigrant(s) at an income that is at least 125 percent of the Federal poverty guidelines" (emphasis added), and it can be argued that providing that level of support is not necessary if the immigrant can obtain employment at a wage equal to or above the specified level. But the next sentence in the form is that "I understand that my obligation will continue until my death or the sponsored immigrant(s) have become U.S. citizens, can be credited with 40 quarters of work, depart the United States permanently, or die"—a list of terminating conditions that does not include the immigrant's failing to seek employment diligently. The wording of the form has been changed slightly since the one Mund signed—see www.uscis.gov/files/form/i-864.pdf; also http://www.uscis.gov/files/form/i-864instr.pdf (both visited June 28, 2012)—but the changes do not allude to a sponsored immigrant's duty to mitigate damages.

So far as we can tell, neither the Congress that enacted sections 1182 and 1183a of the Immigration and Nationality

Act nor the immigration authorities that promulgated implementing regulations and have drafted successive versions of Form I-864 ever thought about mitigation of damages. The government in asking us to read a duty of mitigation into the form invokes "ancient principles of law" and specifically the "canon" of statutory construction that statutory repeals of common law rules are disfavored, and adds that the failure to impose a duty of mitigation would be "unfair" to sponsors of immigrants and discourage the legislative goal of promoting "self-sufficiency" of immigrants. But the hoary maxim that statutory repeals of common law rules are disfavored is a poor guide to legislative meaning, for it is the fossil remnant of the traditional hostility of English judges to legislation. Those judges had made up the common law, which for an age was virtually the entire law of England, and they resented legislative interlopers. E.g., William D. Popkin, *Statutes in Court: The History and Theory of Statutory Interpretation* 16 (1999); William Burnham, *Introduction to the Law and Legal System of the United States* 52 (4th ed. 2006); Gareth Jones, "Should Judges Be Politicians, The English Experience," 57 *Ind. L.J.* 211, 212-13 (1982); Jefferson B. Fordham & J. Russell Leach, "Interpretation of Statutes in Derogation of the Common Law," 3 *Vanderbilt L. Rev.* 438, 440-41 (1950). One would hardly expect legislators to respond by being careful not to step into the common law flower bed.

What is true is that legislation is rarely complete. Ordinarily it's enacted against a rich background of existing law, much of it common law; the background supplies the details that the legislators didn't bother to specify.

The duty to mitigate is a conventional part of the common law of contracts and can be enforced against a third-party beneficiary, *Cordero Mining Co. v. U.S. Fidelity & Guarantee Ins. Co.*, 67 P.3d 616, 626 (Wyo. 2003); *Anderson v. Rexroad*, 306 P.2d 137, 147 (Kan. 1957); *Januska v. Mullins*, 46 N.W.2d 398, 402 (Mich. 1951); *Restatement (Second) of Contracts* § 309(4) (1981), because a third-party beneficiary has the duties as well as the rights of a signatory to the contract. But the question is whether reading a duty of mitigation into the immigration statute and the regulations and the affidavit-contract would serve or disserve statutory and regulatory objectives. Cf. *Prudential Ins. Co. v. Athmer*, 178 F.3d 473, 475 (7th Cir. 1999). If it would disserve them, a common law principle gives way.

The Justice Department argues as we noted that to impose a duty to mitigate would encourage immigrants to become self-sufficient. But self-sufficiency, though mentioned briefly in the House Conference Report on the 1996 statute as a goal, see H.R. Rep. No. 104-828, p. 241 (1996), is not the goal stated in the statute; the stated statutory goal, remember, is to prevent the admission to the United States of any alien who "is likely at any time to become a public charge." See also *Love v. Love*, 33 A.3d 1268, 1276-77 (Pa. Super. Ct. 2011); Kerry Abrams, "Immigration Law and the Regulation of Marriage," 91 *Minn. L. Rev.* 1625, 1704 (2007). The direct path to that goal would involve imposing on the sponsor a duty of support with no excusing conditions. Some such conditions are specified; but why should the judiciary add to them—specifically why should it make failure to mitigate a further excusing condition? The only beneficiary

of the duty would be the sponsor—and it is not for his benefit that the duty of support was imposed; it was imposed for the benefit of federal and state taxpayers and of the donors to organizations that provide charity for the poor. And Mund can't argue that Form I-864 confused him, for there is no reference in it to a duty of the sponsored immigrant (Liu) to mitigate the damages caused her by the sponsor's (Mund's) breach of his duty of support.

The absence of such a duty serves the statutory objective in a second way: it tends to make prospective sponsors more cautious about sponsoring immigrants. The sponsor is the guarantor of the sponsored immigrant's having enough (though just barely enough) income to avoid becoming a public charge. The more extensive—the less qualified—the guaranty, the less likely is an irresponsible immigrant to obtain sponsorship. Liu and Mund had an awful marriage. Had he known that by bringing her to the United States he would be assuming a virtually unconditional obligation to support her indefinitely even if they later divorced, he might not have signed the affidavit, and the couple might have remained in China—and perhaps divorced there, ending her right to become a permanent resident of the United States.

The support obligation that the law imposes on the sponsor is limited. The poverty-line income is meager, even when enhanced by 25 percent, and a sponsored immigrant has therefore a strong incentive to seek employment, quite apart from having any legal duty to do so in order to secure the meager guaranty. It is true that the duty of support acts as a heavy tax on earned

income: if Liu earned $15,000 a year, she would be working full time for a year for a net gain of only $1,500 ($15,000 - $13,500, the latter being the approximate amount of the support obligation, which she would give up if she had a higher income). But she might be able to get, or work her way up to, a much better job than one that pays $15,000, which is barely minimum wage. College educated, she may just need to improve her spoken English to get a good job. Most Chinese immigrants nowadays do very well in the United States. Pew Research Center, "The Rise of Asian Americans" 38-39 (June 2012), www.pewsocialtrends.org/files/2012/06/SDT-The-Rise-of-Asian-Americans-Full-Report.pdf (visited June 30, 2012).

In sum, we can't see much benefit to imposing a duty to mitigate on a sponsored immigrant. The cost, besides the sponsor's diminished incentive to screen the alien for a bad work ethic, would be the increased complication of enforcing the duty of support by giving the sponsor a defense—and not even a defense likely to prevail. If Liu doesn't want to work, forcing her to make job applications is unlikely to land her a job. It is easy enough for an applicant to make herself an unattractive hire. Mund's interposition of the defense may be motivated more by spite than by greed. The last thing federal courts need is to be dragged into domestic-relations disputes.

There is also the question of what body of law we would look to for the contours of a duty to mitigate in a case like this. The duty is federal and so would presumably be defined by federal common law. We are not pointed to any federal common law duty of mandatory job search, so the

federal courts would have to create one for I-864 cases (should the courts ever see another one—which would be likely if we upheld the district court). It hardly seems worth the effort.

Another objection is the proposal's lack of authoritative sponsorship. The government's amicus curiae brief is signed only by Justice Department lawyers. There is no indication of consultation with the Department of Homeland Security, the frontline enforcer of the nation's immigration laws. And if the government is serious about wanting to impose a duty of mitigation, why hasn't it revised Form I-864 to include such a duty? It revised the affidavit subsequent to the version Mund signed to make explicit that "divorce **does not** terminate your obligations under this Form I-864" (boldface in original), which before had merely been implicit.

The judgment of the district court is reversed so far as concerns the court's imposition of a duty of mitigation, and otherwise is affirmed.