BRYANT, Judge.
 

 *804
 
 Where defendant-parents indicated they understood the contract they were signing and were not misled, defendant-parents are bound by the terms of the Form I-864 Affidavit of Support in which they agreed to provide support for defendant-wife. Further, where defendant-parents have not offered proof of either procedural or substantive unconscionability, we affirm the order of the trial court. Where the trial court's determination that the disputed $150,000.00 is marital property is supported
 
 *805
 
 by competent evidence, we affirm. Lastly, where the trial court erred in concluding as a matter of law that defendant-wife has a continuing duty to mitigate her damages under the Form I-864 affidavit, we reverse.
 

 Defendant Lingling Deng ("Lingling"), a Chinese citizen, married plaintiff Rui Dong Zhu ("plaintiff-husband"), a U.S. citizen, on 17 January 2012 in Wake County, North Carolina. Lingling is twenty-eight years old and lived in China prior to coming to the United States to live in January 2012. Lingling and plaintiff-husband dated for several years before Lingling moved to the U.S. Chang Zhu and Ping Li (collectively "defendant-parents," individually, "defendant-father" and "defendant-mother", respectively) are the parents of plaintiff-husband.
 

 In December 2011 and January 2012, plaintiff-husband and Lingling had two wedding parties in their respective hometowns in China. Many guests gave cash gifts, and in February 2012, $150,000.00 was transferred in three separate transactions from Lingling's father, mother, and younger brother in China into a joint account in the United States in the name of Lingling and plaintiff-husband.
 

 Lingling came to the United States on a K-1 visa. Defendant-parents and plaintiff-husband were the sponsors for Lingling when she immigrated to the United States. In order for Lingling to be admitted to the U.S. and become a permanent resident, plaintiff-husband and defendant-parents executed a Form I-864 Affidavit of Support ("Form I-864A").
 
 [1]
 

 On 17 May 2012, $110,239.89 of the $150,000.00 in the joint account was transferred
 
 *811
 
 to defendant-parents to pay off the mortgage on their Raleigh home, where defendant-parents, plaintiff-husband, and Lingling all lived. Also from the $150,000.00, $25,000.00 was used to contribute to the purchase of a tailor shop located in Raleigh. The tailor shop, known as Lulu's Tailor Shop, was purchased in September 2012.
 

 Less than a year and a half after being married, on 31 July 2013, defendant-mother forced Lingling to leave the Raleigh home. The two had argued when Lingling asked that the $150,000.00 be repaid. Thereafter, Lingling moved in with a friend and has not lived with plaintiff-husband or his parents since that time.
 

 In September 2013, Lingling spoke with defendant-father, who indicated that they would sell the Raleigh home and the tailor shop and repay
 
 *806
 
 her. He also told her they would pay for her living expenses. Defendant-parents paid Lingling two months' worth of support, $1,000.00 in August and $1,200.00 in September 2013. They paid no support after those dates. When the tailor shop sold for $40,000.00 in September 2013, Lingling received no portion of the proceeds from the sale.
 

 On 13 September 2013, Lingling filed a complaint in Wake County Superior Court for money owed and a temporary restraining order ("TRO") against defendant-parents. Plaintiff-husband moved to intervene and stay the matter filed by Lingling in Superior Court, and both motions were granted. Meanwhile, plaintiff-husband also filed a complaint in Wake County District Court on 7 October 2013 for equitable distribution of the marital property which he claimed belonged to him and Lingling,
 
 i.e.
 
 , the $150,000.00 which Lingling claimed was owed to her by defendant-parents. On 31 December 2013, Lingling answered and counterclaimed for support and cross-claimed against defendant-parents for support and money owed. Defendant-parents cross-claimed for declaratory judgment.
 

 The parties' claims came on for hearing before the Honorable Anna E. Worley during the 28 October 2014 civil session of Wake County District Court. Judge Worley entered an order and judgment on the parties' competing claims dated 10 April 2015, ordering, in relevant part, that Lingling was entitled to: (1) a constructive trust in the Raleigh home in the amount of $55,120.00; (2) a constructive trust in the proceeds from the sale of the tailor shop in the amount of $12,500.00; (3) a judgment against defendant-parents, jointly and severally, in the amount of $67,620.00; (4) a judgment against plaintiff-husband and defendant-parents, jointly and severally, in the amount of $18,341.00 for support owed from August 2013 through November 2014; and (5) monthly support payments in the amount of $1,215.00 from plaintiff-husband and defendant-parents. Defendant-parents filed notice of appeal and Lingling filed and served a cross-appeal on 21 May 2016. Plaintiff-husband did not appeal.
 

 _________________________
 

 I. Defendant-Parents' Appeal
 

 On appeal, defendant-parents argue the trial court erred by (1) finding that the I-864A forms were an enforceable contract against defendant-parents; (2) finding Lingling was entitled to fifty percent of the proceeds from the sale of the tailor shop; and (3) dismissing defendant-parents' counterclaim against Lingling for the living expenses defendant-parents spent on her.
 

 *807
 
 1.
 
 Form I-864A
 

 Defendant-parents first argue that the trial court erred in concluding that Lingling was entitled to ongoing support based on the Form I-864A defendant-parents executed and submitted to the United States Citizenship and Immigration Services ("USCIS"), as the contract is unconscionable and therefore unenforceable. In the alternative, even if the Form I-864A is enforceable, defendant-parents contend that Lingling is barred from claiming the full amount of support under the contract because she has unreasonably failed to mitigate her damages. Lastly, defendant-parents argue that even if the trial court correctly found Lingling was entitled to some support under the contract, the trial court erred by not setting off the
 
 *812
 
 award from support previously provided to Lingling. We disagree.
 

 An immigrant who is likely to become a public charge is not eligible for admission into the United States unless her application for admission is accompanied by a Form I-864 Affidavit of Support.
 
 8 U.S.C. § 1182
 
 (a)(4) (2015). Those persons petitioning for an immigrant to be admitted to the U.S. must sign a Form I-864A and, as signing sponsors, are obligated to provide the immigrant with whatever support is necessary to maintain the sponsored immigrant at an annual income that is at least 125% of the federal poverty level pursuant to the annual guideline.
 
 Younis v. Farooqi
 
 ,
 
 597 F.Supp.2d 552
 
 , 554 (D. Md. 2009). A Form I-864A "is considered a legally enforceable contract between the sponsor and the sponsored immigrant."
 

 Id.
 

 (citation omitted). "The signing sponsor submits himself to the personal jurisdiction of any federal or state court in which a civil lawsuit to enforce the affidavit has been brought."
 

 Id.
 

 (citing 8 U.S.C. § 1183a(a)(1)(C) (2015) ). "The sponsor's obligation under the affidavit does not terminate in the event of divorce."
 

 Id.
 

 (citation omitted).
 

 Here, defendant-parents executed a Form I-864A which specifically states that, as signors, they "[p]romise to provide any and all financial support necessary to assist the sponsor [plaintiff-husband] in maintaining the sponsored immigrant(s) at or above [125 percent of the Federal Poverty Guidelines] during the period in which the affidavit of support is enforceable[,]" and "agree to be jointly and severally liable for payment of any and all obligations owed by the sponsor [plaintiff-husband] under the affidavit of support to the sponsored immigrant." Further, defendant-mother testified that she understood when she signed the contract that if Lingling could not support herself financially, defendant-mother would be obligated to help plaintiff-husband pay for Lingling's needs. Indeed, an accountant and an attorney both assisted with the preparation of
 
 *808
 
 the immigration documents, and the attorney spoke Mandarin Chinese. Even so, our North Carolina jurisprudence makes very clear that "one who signs a paper writing is under a duty to ascertain its contents, and in the absence of a showing that he was willfully misled or misinformed ... he is held to have signed with full knowledge and assent as to what is therein contained."
 
 Martin v. Vance
 
 ,
 
 133 N.C.App. 116
 
 , 121-22,
 
 514 S.E.2d 306
 
 , 310 (1999) (quoting
 
 Gas House, Inc. v. S. Bell Telephone Co.
 
 ,
 
 289 N.C. 175
 
 , 180,
 
 221 S.E.2d 499
 
 , 503 (1976) ). As defendant-parents make no argument that their son, plaintiff-husband, misled them in any way, defendant-parents are bound by the terms of the Form I-864A which they signed and in which they agreed to provide support for Lingling.
 

 Further, claims that I-864A forms are unconscionable have been explicitly rejected.
 
 See, e.g.
 
 ,
 
 Al-Mansour v. Shraim
 
 , Civil No. CCB-10-1729,
 
 2011 WL 345876
 
 , at *3 (D. Md. Feb. 2, 2011) (unpublished) ("While the Form I-864 may be a contract of adhesion under Maryland law, it is not unconscionable.");
 
 Cheshire v. Cheshire
 
 , No. 3:05-cv-00453-TJC-MCR,
 
 2006 WL 1208010
 
 , at *4 (M.D. Fla. May 4, 2006) (unpublished) ("[T]he Court fails to find evidence that the affidavit of support Form I-864 was an unconscionable or illusory contract...."). Under North Carolina law, a contract will be found to be unconscionable "only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense," and where the terms are "so one-sided that the contracting party is denied any opportunity for a meaningful choice[.]"
 
 Brenner v. Little Red School House Ltd.
 
 ,
 
 302 N.C. 207
 
 , 213,
 
 274 S.E.2d 206
 
 , 210 (1981) (citation omitted). The party claiming unconscionability has the burden to prove both procedural and substantive unconscionability.
 
 Tillman v. Commercial Credit Loans, Inc.
 
 ,
 
 362 N.C. 93
 
 , 102,
 
 655 S.E.2d 362
 
 , 370 (2008) (citations omitted). Defendant-parents have not offered proof of either procedural or substantive unconscionability, and accordingly, their argument is overruled.
 

 Defendant-parents also argue that Lingling should be barred from claiming the full amount of support as she has failed to mitigate her damages under the Form I-864A contract. As Lingling has no affirmative duty to mitigate her damages under such a contract,
 
 see, e.g.
 
 ,
 
 *813
 

 Wenfang Liu v. Mund
 
 ,
 
 686 F.3d 418
 
 , 422 (7th Cir. 2012) ("[W]e can't see much benefit to imposing a duty to mitigate on a sponsored immigrant.");
 
 see also infra
 
 § II.2 (addressing specifically a sponsored immigrant's duty to mitigate damages pursuant to Form I-864A), this argument is overruled.
 

 Defendant-parents also argue that because the trial court awarded Lingling a judgment against defendant-parents in the amount of $67,620.00, this "large amount of cash" would render her no longer a
 
 *809
 
 "public charge" under the terms of the Form I-864A. Thus, defendant-parents contend that the amount of support they may be required to pay Lingling should be set off by the judgment Lingling obtained against them. Defendant-parents cite to no authority to support their argument that a sponsored immigrant is not entitled to support under a Form I-864A because of any "assets" he or she has; rather, relevant case law suggests the contrary to be true.
 
 See
 

 Al-Mansour
 
 ,
 
 2011 WL 345876
 
 , at *4-5 (rejecting the sponsor's claim that he was not obligated to provide support under a Form I-864A contract where he had given his wife an apartment during their marriage).
 

 Assets do not amount to income, and a judgment, even a monetary one, is not necessarily an asset for purposes of income.
 
 See
 
 id.
 

 (rejecting sponsor's argument that immigrant-spouse's income exceeded 125% of the poverty line where sponsor failed to demonstrate that proceeds from the sale of an apartment were transferred to the immigrant-spouse "or that she derived any other income from the property"). Notably, plaintiff-husband listed $150,000.00 under a heading titled "
 
 Assets of the principal sponsored immigrant
 
 " on his Form I-864A. This fact had no bearing or impact on the government's requirement that contracts of support were necessary for Lingling to become a permanent resident, and nor should a judgment against defendant-parents in the amount of $67,620. This argument is overruled.
 

 2.
 
 Proceeds from Sale of Tailor Shop
 

 Defendant-parents contend the trial court erred in awarding Lingling a constructive trust in the proceeds from the sale of the tailor shop in the amount of $12,500, fifty percent of the initial purchase money contributed by plaintiff-husband and Lingling ($25,000.00). Defendant-parents argue that Lingling, as a 25%-owner of Lulu's Tailor Shop, is only entitled to twenty-five percent of the net proceeds ($40,000.00) from the sale of the tailor shop after winding up and accounting of the business, net proceeds being the sale price subtracted by the transaction cost and debts and liabilities to be paid by the company. We disagree.
 

 In their appellant brief, defendant-parents fail to support this argument with any citation to legal authority. They state, "[u]pon the dissolution of the company, an owner of the company shall only get his or her share of the NET proceeds. The net proceeds shall be the sale price subtracted by the transaction cost and debts and liabilities to be paid by the company." Defendant-parents cite to no statute or case law to support these statements and, in turn, their argument. "A party's assignment of error is deemed abandoned in the absence of citation to supporting
 
 *810
 
 authority."
 
 Consol. Elec. Distribs., Inc. v. Dorsey
 
 ,
 
 170 N.C.App. 684
 
 , 686-87,
 
 613 S.E.2d 518
 
 , 520 (2005) (citing
 
 State v. Walters
 
 ,
 
 357 N.C. 68
 
 , 85,
 
 588 S.E.2d 344
 
 , 355 (2003) );
 
 see
 

 id.
 
 at 686,
 
 613 S.E.2d at 520
 
 (quoting N.C. R. App. P. 28(b)(6) ) (deeming appeal abandoned where defendant only quoted one statute and made reference to another). Accordingly, as defendant-parents have failed to support their argument with stated or cited authority, we deem their argument abandoned.
 

 3.
 
 Dismissal of Defendant-Parents' Counterclaim
 

 Defendant-parents argue that the trial court erred in dismissing their counterclaim against Lingling for living expenses. We disagree.
 

 Defendant-parents' argument is limited to contending that their provision of lodging and living expenses for Lingling and plaintiff-husband was conditioned on Lingling and plaintiff-husband paying off defendant-parents' mortgage on the Raleigh home in which all parties lived. However, defendant-parents
 
 *814
 
 have again failed to provide any citation to authority which would support their proposition that the trial court erred in dismissing their counterclaim where the trial court found and concluded that defendant-parents "have failed to prove by the greater weight of the evidence that they have a claim against [Lingling] for the monies they allegedly spent on [Lingling]." "Under our appellate rules, it is the duty of appellate counsel to provide sufficient legal authority to this Court, and failure to do so will result in dismissal."
 
 Moss Creek Homeowners Ass'n, Inc. v. Bissette
 
 ,
 
 202 N.C.App. 222
 
 , 233,
 
 689 S.E.2d 180
 
 , 187 (2010) (citing N.C. R. App. P. 28(b)(6) ). Accordingly, this Court will not endeavor to construct an argument for defendant-parents (represented by appellate counsel), and we dismiss this argument on appeal.
 

 II. Lingling's Cross-Appeal
 

 On cross-appeal, Lingling argues the trial court erred in its (1) Finding of Fact No. 14 that Lingling failed to rebut the presumption that the $150,000.00 was marital property, and Findings of Fact Nos. 23 and 24, and Conclusions of Law Nos. 3, 7, and 8; and (2) finding and conclusion that Lingling has a duty to mitigate her damages.
 

 1.
 
 Finding of Fact No. 14
 

 Lingling argues the trial court erred in making its Finding of Fact No. 14 that she failed to rebut the presumption that the $150,000.00 that was transferred into the joint account of plaintiff-husband and Lingling was marital property. As a result, Lingling also argues that Findings of Fact Nos. 23 and 24, and Conclusions of Law Nos. 3, 7, and 8, which
 
 *811
 
 depend on the trial court's Finding of Fact No. 14, are also erroneous. We disagree.
 

 "A trial court's determination that specific property is to be characterized as marital, divisible, or separate property will not be disturbed on appeal 'if there is competent evidence to support the determination.' "
 
 Brackney v. Brackney
 
 ,
 
 199 N.C.App. 375
 
 , 381,
 
 682 S.E.2d 401
 
 , 405 (2009) (quoting
 
 Holterman v. Holterman
 
 ,
 
 127 N.C.App. 109
 
 , 113,
 
 488 S.E.2d 265
 
 , 268 (1997) ). "Ultimate, the court's equitable distribution award is reviewed for abuse of discretion and will be reversed 'only upon a showing that it [is] so arbitrary that it could not have been the result of a reasoned decision.' "
 

 Id.
 

 (alteration in original) (quoting
 
 White v. White
 
 ,
 
 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985) ).
 

 Lingling's main dispute in challenging Findings of Fact Nos. 14, 23, and 24 and Conclusions of Law Nos. 3, 7, and 8,
 
 see
 

 infra
 
 , is with the trial court's classification of the $150,000.00 transferred into the joint account by Lingling's father and other relatives as marital property:
 

 14. The $150,000 that was transferred into the joint account of [Lingling] and Plaintiff by [Lingling's] father and other relatives belonged to both [Lingling] and Plaintiff. [Lingling] has failed to rebut the presumption that this money was marital as it was acquired during the marriage. Irrespective of the source of the money-i.e., whether it was money that [Lingling's] father gave her to use as she saw fit or whether it was cash given to [Lingling] and Plaintiff by the guests at the parties in China that was collected by [Lingling's] father, or a combination of the two, [Lingling] and Plaintiff treated the money as marital money intended for the use of both of them.
 

 ...
 

 23. The money used to pay off the mortgage on [the] Raleigh home belonged to both Plaintiff and [Lingling]. The $25,000 used to contribute to the purchase of the tailor shop belonged to both Plaintiff and [Lingling]. Thus any obligation owing to [Lingling] and Plaintiff on the part of [defendant-parents] in connection with these transactions is a marital asset. Any such marital asset should be divided equally between Plaintiff and [Lingling]. However Plaintiff has continued to live with his parents and thus has and continues to receive financial benefit from his
 
 *812
 
 share of the money which was used to pay off his parents' mortgage. Plaintiff never expected his parents to repay him for the money used to pay off the mortgage on [the] Raleigh home. [Defendant-parents] never expected to repay Plaintiff for the money used to pay off the mortgage. Plaintiff is therefore
 
 *815
 
 not entitled to a constructive trust in [the] Raleigh home nor a judgment against his parents. Plaintiff has received some of the proceeds from the money paid for the tailor shop. He also got the benefit of income from the business during the period of time it was operated by him and [defendant-mother]. Plaintiff is therefore not entitled to a constructive trust against the proceeds of the tailor shop.
 

 24. [Lingling] is entitled to a constructive trust in the Raleigh Home and the equity in [the] Raleigh Home equivalent to 50% of the monies that were used to pay off the mortgage on [the] Raleigh home. [Lingling] is thus entitled to a constructive trust in [the] Raleigh Home and in her favor in the amount of $55,120. In addition, [Lingling] is entitled to a constructive trust in the proceeds from the sale of the tailor shop in the amount of $12,500 representing 50% of those funds coming from [Lingling] and Plaintiff and used to purchase Lulu's Tailor Shop.
 

 ...
 

 CONCLUSIONS OF LAW
 

 ...
 

 3. During the course of their marriage [Lingling] and Plaintiff acquired $150,000. [Lingling] and Plaintiff used $110,239.89 of this money to pay the mortgage of Defendants Zhu and Li on the home which they own as tenants by the entireties. They also contributed $25,000 to the purchase of a tailor shop.
 

 ...
 

 7. [Lingling] is entitled to a constructive trust in the Raleigh Home equivalent to 50% of the monies that were used to pay off the mortgage on [the] Raleigh home. The constructive trust in the Raleigh Home would thus be for $55,120. In addition, [Lingling] is entitled to a constructive
 
 *813
 
 trust in the proceeds from the sale of the tailor shop in the amount of $12,500 representing 50% of those funds coming from [Lingling] and Plaintiff used to purchase Lulu's Tailor Shop.
 

 8. [Lingling] is also entitled to a judgment against [defendant-parents], jointly and severally, in the amount of $67,620.
 

 "Marital property" is defined as "all real and personal property acquired by either spouse or both spouses during the course of the marriage and before the date of the separation of the parties, and presently owned[.]"
 
 N.C. Gen. Stat. § 50-20
 
 (b)(1) (2015). In contrast, "[s]eparate property" includes
 

 all real and personal property acquired by a spouse before marriage or acquired by a spouse by devise, descent, or gift during the course of the marriage. ... Property acquired in exchange for separate property shall remain separate property regardless of whether the title is in the name of the husband or wife or both and shall not be considered to be marital property unless a contrary intention is expressly stated in the conveyance.
 

 Id.
 

 § 50-20(b)(2) ;
 
 see also
 

 Wade v. Wade
 
 ,
 
 72 N.C.App. 372
 
 , 381,
 
 325 S.E.2d 260
 
 , 269 (1985) (rejecting the theory of transmutation, which holds that "affirmative acts of augmenting separate property by commingling it with marital resources is viewed as indicative of intent to transmute ... the separate property to marital property" (citations omitted)) ("[W]e discern from the statute a clear legislative intent that separate property brought into the marriage or acquired by a spouse during the marriage be returned to that spouse, if possible, upon dissolution of the marriage."). "In equitable distribution proceedings, the party claiming a certain classification has the burden of showing, by a preponderance of the evidence, that the property is within the claimed classification."
 
 Brackney
 
 ,
 
 199 N.C.App. at 383
 
 ,
 
 682 S.E.2d at
 
 406 (citing
 
 Joyce v. Joyce
 
 ,
 
 180 N.C.App. 647
 
 , 650,
 
 637 S.E.2d 908
 
 , 911 (2006) ).
 

 "[W]hen property is acquired during marriage by one spouse from his or her parent(s), a rebuttable presumption arises that the transfer is a gift to that spouse."
 
 Caudill v. Caudill
 
 ,
 
 131 N.C.App. 854
 
 , 857,
 
 509 S.E.2d 246
 
 , 249 (1998) (citing
 
 Burnett v. Burnett
 
 ,
 
 122 N.C.App. 712
 
 , 714,
 
 471 S.E.2d 649
 
 , 651 (1996) ). "In such a case, the presumption must be rebutted by the spouse resisting the separate property classification
 
 *814
 
 by showing a lack of donative intent."
 

 Id.
 

 (citation omitted). However, "[t]he trial
 
 *816
 
 judge [in an equitable distribution action] is the sole arbiter of credibility and may reject the testimony of any witness in whole or in part."
 
 Joyce
 
 ,
 
 180 N.C.App. at 650
 
 ,
 
 637 S.E.2d at 911
 
 (alterations in original) (quoting
 
 Fox v. Fox
 
 ,
 
 114 N.C.App. 125
 
 , 134,
 
 441 S.E.2d 613
 
 , 619 (1994) ).
 

 Additionally, "[t]he deposit of funds into a joint account, standing alone, is not sufficient evidence to show a gift or an intent to convert the funds from separate property to marital property."
 
 Manes v. Harrison-Manes
 
 ,
 
 79 N.C.App. 170
 
 , 172,
 
 338 S.E.2d 815
 
 , 817 (1986) (citation omitted) (holding bank account and annuity purchased by husband with separate assets remained separate property of husband, even where husband added wife's name to bank account and annuity);
 
 see also
 

 Fountain v. Fountain
 
 ,
 
 148 N.C.App. 329
 
 , 333,
 
 559 S.E.2d 25
 
 , 29 (2002) ("Commingling of separate property with marital property, occurring during the marriage and before the date of separation, does not necessarily transmute separate property into marital property." (citations omitted)).
 
 But see
 

 Langston v. Richardson
 
 ,
 
 206 N.C.App. 216
 
 , 222-23,
 
 696 S.E.2d 867
 
 , 872 (2010) (finding that bank accounts were marital property where wife's name was added to the accounts during her marriage to husband and prior to their separation).
 

 In the instant case, the property in dispute is $150,000, which was transferred from Lingling's father "and other relatives" into a joint account in the name of both Lingling and plaintiff-husband. Lingling concedes that "[t]he evidence as to the original source of the $150,000 is quite controverted." Indeed, the trial court did not make an explicit finding as to the ultimate source of the $150,000. It is clear from the record, however, that the $150,000 was transferred into the joint account in three separate transactions of $50,000 each, by three separate individuals, all relatives of Lingling: on 10 February 2012, $50,000.00 was wired from "Zhang Limei," Lingling's mother; on 13 February 2012, $100,000.00 was wired in $50,000 increments from "Jinhong Deng," Lingling's father, and "Binbin Deng," Lingling's younger brother, respectively.
 

 At the hearing, plaintiff-husband testified the $150,000 was "our wedding gift[,]" that the money "came from wedding gifts given-cash wedding gifts given at the celebration of [their] marriage in [Lingling's] hometown[.]" Plaintiff-husband testified, in relevant part, as follows:
 

 Q. After the ceremony in January 2012, did Lingling and you have a discussion about how much cash was given as gifts?
 

 *815
 
 A. About $150,000.
 

 Q. Okay. And did you and Lingling have a discussion about what should happen to this money?
 

 A. At that time we didn't.
 

 ...
 

 Q. On the second page of the document, do you see where $150,000 was deposited into the [joint] account?
 

 A. Yes, I saw it.
 

 Q. Okay. And what was your understanding as to where this 150,000 came from?
 

 A. It should be the wedding money we got from the ceremony.
 

 Q. Okay. During the time that you and Lingling were together and living with your parents, did she ever describe this money as a loan to you?
 

 A. Yeah. It's almost like until we started like separated and she started saying that.
 
 [
 

 2
 

 ]
 

 ...
 

 Q. Was there any time during the period of time that you and Lingling were living together in your parents' household that she described this 150,000 as a loan?
 

 A. No, never.
 

 Q. Okay. When did you first hear from Lingling that this $150,000 was a loan from her family?
 

 A. After I overheard-after I overheard her telling her friend that she married me was just for immigration, after that.
 

 ...
 

 *817
 

 *816
 
 Q. When approximately did you overhear her make this statement?
 

 A. About June 2013.
 

 Q. Okay. And prior to June of 2013, had Lingling ever characterized this $150,000 as a loan from her family?
 

 A. No.
 

 Lingling testified, on the other hand, that she could "guarantee you in [her] life this is not wedding gift money[,]" and that the $150,000.00 was intended to be her money as "the control of the [$150,000.00] was given to me by my parents." She also testified that not only was it "[un]reasonable to believe that $150,000 in cash would have been given as gifts at the second wedding celebration," but also that it was "impossible." Further, she testified the $150,000.00 was wired into a joint account "[b]ecause I just came to United States and I did not have my separate account."
 

 However, it remains that the trial judge in an equitable distribution action is the sole arbiter of credibility and may reject the testimony of any witness,
 
 see
 

 Joyce
 
 ,
 
 180 N.C.App. at 650
 
 ,
 
 637 S.E.2d at 911
 
 (citation omitted), and this Court reviews a trial court's classification of property for abuse of discretion,
 
 Brackney
 
 ,
 
 199 N.C.App. at 381
 
 ,
 
 682 S.E.2d at 405
 
 (citations omitted). Thus, as the trial court's determination that the $150,000 is marital property is supported by competent evidence, that determination will not be disturbed on appeal, and we affirm the trial court on this issue. Lingling's argument is overruled.
 

 2.
 
 Duty to Mitigate Damages
 

 Lingling also contends the trial court erred in finding and concluding that she has a continuing duty to mitigate her damages under the contract of support, as laid out in Finding of Fact No. 37 and Conclusions of Law Nos. 16 and 17. We agree.
 

 "Conclusions of law drawn by the trial court form its findings of fact are reviewable
 
 de novo
 
 on appeal."
 
 Carolina Power & Light Co. v. City of Asheville
 
 ,
 
 358 N.C. 512
 
 , 517,
 
 597 S.E.2d 717
 
 , 721 (2004) (citation omitted).
 

 Here, as an initial matter, the trial court's findings which Lingling challenges within Finding of Fact No. 37-that Lingling "has mitigated her damages under the [Form I-864A] contract of support and has a continuing duty to mitigate her damages"-are essentially conclusions of law, and they will be treated as conclusions of law which are reviewable
 
 *817
 

 de novo
 
 on appeal.
 
 See
 

 Smith v. Beaufort Cnty. Hosp. Ass'n, Inc.
 
 ,
 
 141 N.C.App. 203
 
 , 214,
 
 540 S.E.2d 775
 
 , 782 (2000) (citation omitted).
 

 The Form I-864A is required for a person who wants to sponsor an alien for admission to the United States. 8 C.F.R. § 213a.2(a), (b) (2016) ;
 
 see also
 

 8 U.S.C. § 1182
 
 (a)(4)(C)(ii). The Form I-864A's contents are specified in 8 U.S.C. § 1183a, and as such, this is essentially an issue of statutory interpretation.
 
 See
 

 Wenfang Liu
 
 ,
 
 686 F.3d at 421
 
 ("But the question is whether reading a duty of mitigation into the immigration statute and the regulations and the affidavit-contract would serve or disserve statutory and regulatory objectives." (citation omitted)).
 

 "The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent."
 
 Martin v. N.C. Dep't of Health & Human Servs.
 
 ,
 
 194 N.C.App. 716
 
 , 719,
 
 670 S.E.2d 629
 
 , 632 (2009) (quoting
 
 Burgess v. Your House of Raleigh, Inc.
 
 ,
 
 326 N.C. 205
 
 , 209,
 
 388 S.E.2d 134
 
 , 137 (1990) ). "This intent 'must be found from the language of the act, its legislative history and the circumstances surrounding its adoption which throw light upon the evil sought to be remedied.' "
 
 Burgess
 
 ,
 
 326 N.C. at 209
 
 ,
 
 388 S.E.2d at 137
 
 (quoting
 
 Milk Comm'n v. Food Stores
 
 ,
 
 270 N.C. 323
 
 , 332,
 
 154 S.E.2d 548
 
 , 555 (1967) ).
 

 Finding of Fact No. 37 and Conclusions of Law Nos. 16 and 17 are as follows:
 

 37. [Lingling] speaks no English. She has very little in the way of work skills to obtain employment in the United States. [Lingling] has mitigated her damages under the contract of support and has a continuing duty to mitigate her damages. She has attempted to obtain a job but has been unsuccessful given her speech limitations and her lack of work skills. [Lingling]
 

 *818
 
 has had no income since she and Plaintiff separated other than the $2200 paid by [defendant-parents] in August and September, 2013 (see below). [Lingling] is entitled to judgment against Plaintiff, [and defendant-parents], jointly and severally, for $4976 ($7176 for supported owed from August 2013 through January 201[4] less $2200 for the two months of support that was paid) and for $13,365 for support owed from February 2014 through November, 2014.
 

 ...
 

 *818
 
 16. [Lingling] has had no income since she and Plaintiff separated. [Lingling] has attempted to obtain employment but due to the language barrier and her lack of skills she has been unable to find employment.
 

 17. [Lingling] has mitigated her damages under the contract of support and she has a continuing obligation to mitigate her damages.
 

 Pursuant to North Carolina common law, "[t]he duty placed on an injured party to mitigate damages is well established."
 
 Thermal Design, Inc. v. M & M Builders, Inc.
 
 ,
 
 207 N.C.App. 79
 
 , 89,
 
 698 S.E.2d 516
 
 , 523 (2010). "The general rule is that where there has been a breach of contract, the injured party must do 'what fair and reasonable prudence requires to save himself and reduce the damage[.]' "
 
 Turner Halsey Co., Inc. v. Lawrence Knitting Mills, Inc.
 
 ,
 
 38 N.C.App. 569
 
 , 572,
 
 248 S.E.2d 342
 
 , 344 (1978) (quoting
 
 Little v. Rose
 
 ,
 
 285 N.C. 724
 
 , 728,
 
 208 S.E.2d 666
 
 , 669 (1974) );
 
 see also
 

 Blakeley v. Town of Taylortown
 
 ,
 
 233 N.C.App. 441
 
 , 450,
 
 756 S.E.2d 878
 
 , 884-85 (2014) ("Under the law in North Carolina, an injured plaintiff must exercise reasonable care and diligence to avoid or lessen the consequences of the defendant's wrong. If plaintiff fails to mitigate his damages, for any part of the loss incident to such failure, no recovery can be had." (quoting
 
 Lloyd v. Norfolk S. Railway Co.
 
 ,
 
 231 N.C.App. 368
 
 , 371,
 
 752 S.E.2d 704
 
 , 706 (2013) )).
 

 In looking first to the text of the statute in question, 8 U.S.C. § 1183a, the Form I-864A requires the sponsor to agree to provide the sponsored immigrant with "any support necessary to maintain him or her at an income that is at least 125 percent of the Federal Poverty Guidelines...."
 
 See
 
 8 U.S.C. § 1183a(a)(1)(A) (2015). The form also notes that a sponsor's obligations end only in the event the sponsored immigrant:
 

 • Becomes a U.S. citizen;
 

 • Has worked, or can be credited with, 40 quarters of coverage under the Social Security Act;
 

 • No longer has lawful permanent resident status, and has departed the United States;
 

 • Becomes subject to removal, but applies for and obtains in removal proceedings a new grant of adjustment of status, based on a new affidavit of support, if one is required; or
 

 • Dies.
 

 *819
 
 Note that divorce
 
 does not
 
 terminate your obligations under this Form I-864.
 

 Id.
 

 § 1183a(a)(2). Notably, the above list does not include a sponsored immigrant's duty to mitigate damages under such a contract.
 
 See
 

 Wenfang Liu
 
 ,
 
 686 F.3d at 420
 
 (noting the Form I-864 "specifies several excusing conditions," but "does not mention ... failing to mitigate his or her damages").
 

 In an opinion written by Judge Posner, the Seventh Circuit held that a Form I-864A beneficiary has no duty to mitigate damages by seeking employment because,
 
 inter alia
 
 , the federal regulations and the form itself were all silent as to whether the beneficiary had a duty to seek employment:
 

 Recall that the obligation is to support the sponsored alien at 125 percent of the poverty income level; the [I-864] affidavit must include this requirement.
 
 8 U.S.C. § 1183
 
 (a)(1)(A). The affidavit also, however, specifies several excusing conditions, such as the sponsor's death or the alien's being employed for 40 quarters (also specified as an excusing condition in the statute,
 
 8 U.S.C. § 1183
 
 (a)(3)(A) ). But the list of excusing conditions does not mention the alien's failing to seek work or otherwise failing to mitigate his or her damages.
 

 Id.
 

 (holding no federal common law duty to mitigate and that underlying policy behind
 
 *819
 
 Form I-864A was only to prevent the noncitizen from becoming a public charge);
 
 see also
 

 Ainsworth v. Ainsworth
 
 , No. Civ.A. 02-1137-A.,
 
 2004 WL 5219037
 
 , at *2-3 (M.D. La. May 27, 2004) (unpublished) (finding obligation of support fully enforceable against defendant in accordance with Form I-864A),
 
 rev'g in part
 
 No. Civ.A. 02-1137-A-M2,
 
 2004 WL 5219036
 
 , at *2 (M.D. La. Apr. 29, 2004) (unpublished) ("[I]f the sponsored immigrant is earning, or is capable of earning, [125% of the poverty guidelines] or more, there obviously is no need for continued support.").
 
 But see
 

 Naik v. Naik
 
 ,
 
 399 N.J.Super. 390
 
 ,
 
 944 A.2d 713
 
 , 717 (N.J. Super Ct. A.D. 2008) ("[T]he sponsored immigrant is expected to engage in gainful employment, commensurate with his or her education, skills, training and ability to work in accordance with the common law duty to mitigate damages.").
 

 With regard to legislative intent, the Seventh Circuit wrote as follows:
 

 So far as we can tell, neither the Congress that enacted sections 1182 and 1183a of the Immigration and
 
 *820
 
 Nationality Act nor the immigration authorities that promulgated implementing regulations and have drafted successive versions of Form I-864 ever thought about mitigation of damages. ...
 

 ...
 

 The Justice Department argues as we noted that to impose a duty to mitigate would encourage immigrants to become self-sufficient. But self-sufficiency, though mentioned briefly in the House Conference Report on the 1996 statute as a goal, see H.R. Rep. No. 104-828, p. 241 (1996), is not the goal stated in the statute; the stated statutory goal, remember, is to prevent the admission to the United States of any alien who "is likely at any time to become a public charge." The direct path to that goal would involve imposing on the sponsor a duty of support with no excusing conditions. Some such conditions are specified; but why should the judiciary add to them-specifically why should it make failure to mitigate a further excusing condition? The only beneficiary of the duty would be the sponsor-and it is not for his benefit that the duty of support was imposed; it was imposed for the benefit of federal and state taxpayers and of the donors to organizations that provide charity for the poor.
 

 Wenfang Liu
 
 ,
 
 686 F.3d at 421
 
 (internal citations omitted).
 

 An opinion out of federal court in Maryland, on the other hand, concluded that "[a]ssuming the plaintiff ha[d] an obligation to mitigate her damages by seeking employment, she need not apply for every available job in order to mitigate her losses; she need only make reasonable efforts."
 
 Younis
 
 ,
 
 597 F.Supp.2d at 556
 
 (citation omitted). Further, "[i]t is the [sponsor's] burden to prove that the [sponsored immigrant] did not make reasonable efforts[.]"
 

 Id.
 

 (citation omitted). The court in
 
 Younis
 
 noted that regardless of whether the sponsored immigrant obtains employment, or even where the sponsored immigrant is
 
 unwilling
 
 to obtain employment, a sponsor continues to remain liable under the Form I-864A, as this is not a terminating condition.
 

 Id.
 

 at 557 n.5 (citing 8 U.S.C. § 1183a ).
 

 The
 
 Younis
 
 court appears to equivocate where it "assumes" a sponsored immigrant has a duty to mitigate under a Form I-864A, while at the same time acknowledging in a footnote that a sponsor is likely
 
 *821
 
 liable regardless of whether a sponsored immigrant even tries to obtain employment.
 
 See
 

 id.
 

 at 556
 
 , 557 n.5. Such hedging seems to indicate the
 
 Younis
 
 court's reticence to read an explicit duty to mitigate into the statute at issue.
 
 See
 

 Wenfang Liu
 
 ,
 
 686 F.3d at 423
 
 ("And if the government is serious about wanting to impose a duty of mitigation, why hasn't it revised Form I-864 to include such a duty? It revised the affidavit ... to make explicit that 'divorce
 
 does not
 
 terminate your obligations under this Form I-864' (boldface in original), which before had merely been implicit.").
 

 The support obligation that the law imposes on the sponsor is limited. The poverty-line income is meager, even when enhanced by 25 percent, and a sponsored immigrant has therefore a strong incentive to seek employment, quite apart from having any legal duty to do so in order to secure the meager guaranty.
 

 *820
 

 Id.
 

 at 422
 
 . In the instant case, the trial court found that, for the relevant time period, "[t]he federal poverty guidelines in effect beginning January 24, 2013 established $11,490 (x125% = $1,196/mo) as the annual poverty threshold. Beginning January 22, 2014, the threshold [was] $11,670 (x125% = $1,215/mo)." This is indeed a "meager guaranty."
 
 See
 
 id.
 

 Based on the plain language of the Form I-864A, the contents of which are specified in 8 U.S.C. § 1183a, and the legislative history surrounding it, we agree with the Seventh Circuit's reasoning that reading a duty of mitigation into the immigration statute and the Form I-864A would disserve the stated statutory goal: "to prevent the admission to the United States of any alien who 'is likely at any time to become a public charge.' "
 

 Id.
 

 Accordingly, the trial court erred in concluding as a matter of law that Lingling has a continuing duty to mitigate her damages under the Form I-864A contract. The trial court's order is reversed so far as the court's imposition of a duty of mitigation.
 

 AFFIRMED IN PART; REVERSED IN PART.
 

 Judges STEPHENS and DILLON concur.
 

 [1]
 

 The I-864, Affidavit of Support Form is referred to throughout federal and state case law interchangeably as "Form I-864," "Form I-864A," "I-864," and "I-864A." All designations refer to the same form.
 

 [2]
 

 All the parties to this action spoke Chinese as a first language and very little or no English, and the trial court appointed an interpreter who translated in real time. In many instances throughout the transcript, witnesses' statements seem to have been very roughly translated.