IN THE COURT OF APPEALS OF NORTH CAROLINA

2023-NCCOA-2

No. COA22-175

Filed 17 January 2023

Mecklenburg County, No. 16 CVD 16819

JAMES HOWARD PELC, Plaintiff,

v.

MONICA ELIZABETH PHAM, Defendant.

Appeal by defendant from judgment entered 7 June 2021 by Judge Christy T. Mann in Mecklenburg County District Court. Heard in the Court of Appeals 29 November 2022.

*Arnold & Smith, PLLC, by Matthew R. Arnold and Ashley A. Crowder, for the plaintiff-appellant.*

*Miller Bowles Cushing, PLLC, by Brett Holladay, for the plaintiff-appellant.*

*Thurman, Wilson, Boutwell & Galvin, P.A., by John D. Boutwell for the defendant-appellee.*

TYSON, Judge.

James Howard Pelc ("Father") appeals from order entered on 7 June 2021, which awarded to Monica Elizabeth Pham ("Mother"): (1) monetary damages under an United States Citizenship and Immigration Services ("USCIS") Form I-864 Affidavit of Support; (2) equitable damages for Father's failure to repay a loan; and, (3) attorney's fees for Mother's Affidavit of Support claims. The order also denied

attorney's fees for both Mother's and Father's child custody claims. We affirm in part, reverse in part, and remand.

## I. Background

Father and Mother began a romantic relationship in Perth, Australia, and began cohabitating in 2007. The relationship evolved into a "*de facto* relationship" per Australian law, which is analogous to a common-law marriage. Mother and Father are parents of one minor son born on 26 June 2009. The parties resided in Australia until 2014, when they moved to the United States (U.S.).

Father holds dual citizenship in the U.S. and Australia. Mother holds dual citizenship in Australia and New Zealand. Their son is a U.S. and Australian citizen because Father is a U.S. citizen. At the time of trial, Father was 62 years old, and Mother was 50 years old.

Father desired to return to the U.S. in 2014 to be closer to his aging parents. Mother was reluctant, but she agreed to move "on a trial basis" to determine whether she would enjoy living in the U.S. Mother was required to obtain a Fiancée Visa prior to immigrating and entering the U.S. Mother and Father completed and signed a USCIS Form I-134, entitled "Intent to Marry," and confirmed their intent to marry within ninety days upon entry into the U.S. Mother and Father married on 21 July 2014 in the U.S.

For Mother to remain in the U.S., Father also signed and submitted a USCIS

Form I-864, titled an "Affidavit of Support," on 7 August 2014. The Affidavit of Support allows the "intending immigrant [to] establish that he or she is not inadmissible to the United States as an alien likely to become a public charge" by requiring the future spouse to promise to financially support the alien.

¶ 6 The trial court found Father "represented that he was not working but had assets and income from his property from which to support [M]other" on the USCIS Form I-864. Father signed the USCIS Form I-864 Affidavit of Support, promising to maintain his alien wife, an Australian/New Zealand citizen, for her to lawfully remain in the United States for permanent residence.

¶ 7 The parties resided together in the U.S. with the minor son until they separated on 4 November 2016. Father failed to pay any support to Mother after the parties separated.

¶ 8 From November 2016 until April 2017, the parties "nested" with the minor son, meaning "Mother and Father would alternate weeks living in Father's residence with the minor child." The parties eventually stopped "nesting" with their son. The parties have maintained separate households since April 2017.

¶ 9 Neither Mother nor Father were employed for 2014 through 2017. Father has not maintained traditional employment since February 2014. Mother resigned from her job in Australia when she moved to the U.S., per Father's request. Mother, however, later secured a part-time employment during 2018 and a full-time position

in 2019.

¶ 10 Prior to moving to the U.S., Father identified various properties located in different geographic areas. He intended to use one as the family home, and another to be used as a rental property to generate income. In May 2013, Father purchased residential property located in Charlotte. He also purchased property located in Suwanee, Georgia, in August 2013, which he hoped to rent.

¶ 11 Prior to closing on the property in Suwanee, Mother offered funds to Father to avoid financing the property through a traditional loan and borrowing from a lender. Mother was to receive equity in the home for her investment, or alternatively, Father promised to re-pay Mother the interest she was obligated to pay on her on separate line of credit. Mother provided $110,000 Australian dollars ("AUD") to Father in two transactions on 11 and 12 June 2013, which Father subsequently transferred to a U.S. bank account and, upon conversion, received currency proceeds of $104,099 U.S. Dollars ("USD"). Father used those funds to partially purchase the property in Suwanee.

¶ 12 The trial court found that Mother "trusted Father" because of their personal relationship, and Mother considered the transaction as a "loan to Father and not a gift." The trial court also found Mother had relied upon Father's promises to re-pay the funds loaned from her line of credit and her reliance was reasonable.

¶ 13 Father paid Mother $4,071 towards the loan proceeds in 2013 and part of 2014,

which amount equaled the interest accruing on Mother's line of credit. Father subsequently stopped paying Mother in 2014. In one of Father's responses to a motion before the trial, he "admitted that Mother had loaned him the money, admitted that he had paid for a time on the loan, and admitted that it had not been paid in full." Father sold the Suwanee property for a profit in 2018. Father did not re-pay Mother any of the proceeds from the sale nor make any additional payments on the loan.

¶ 14 Following the dissolution of Mother's and Father's relationship in late 2016, Father initiated this litigation after Mother had threatened to take their minor son back to Australia. He sought permanent child custody, temporary emergency custody, and, in the alternative, a motion for temporary parenting arrangement. The litigation has sadly proceeded in a protracted, expensive, contentious, and a highly-conflicted manner since it began.

¶ 15 Mother counterclaimed for a decree of divorce, child custody, child support, attorney's fees, recovery of personal property, monetary damages resulting from breach of contract for support, specific performance of the contract for support, equitable distribution, interim allocation, postseparation support, alimony, unjust enrichment, constructive trust, and resulting trust.

¶ 16 Mother voluntarily dismissed her post-separation support, alimony, and temporary and permanent child support claims without prejudice when trial began.

The remaining claims were tried between 9-11 December 2019. No written order was entered until eighteen months later on 7 June 2021.

The trial court found and concluded: (1) Father owed Mother damages for failing to meet his contractual obligation under the USCIS Form I-864 Affidavit of Support; (2) Mother's claim for *quantum meruit*/unjust enrichment should be granted for the funds Mother provided to finance the purchase of the Georgia rental home and awarded Mother $100,028 USD, the converted amount of the funds minus the payments Father made in 2013 and 2014, together with $33,697.10 USD in interest; (3) Mother's claim for attorney's fees arising out of the Affidavit of Support should be allowed in the amount of $20,000 USD; and, (4) both Mother and Father's claims for attorney's fees related to the child custody agreement should be denied. Father timely appealed on 6 July 2021.

## II.    Appellate Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2021).

## III.    Issues

Father presents extensive arguments regarding the trial court's order on appeal. Those arguments relate to the trial court's findings regarding: (1) the USCIS Form I-864 Affidavit of Support; (2) Mother's loan to Father to purchase the property located in Suwanee, Georgia; and, (3) the award of mother's attorney's fees for those fees related to the Affidavit of Support.

¶ 20     Father also argues he was prejudiced and should be granted a new trial because: (1) a hearing conducted after trial, but before entry of the final order, allowed Mother to make additional arguments; and, (2) certain portions of the trial transcript are missing due to technological glitches.

## IV.     Affidavit of Support

¶ 21     Father first argues the trial court lacked subject matter jurisdiction to adjudicate Mother's Affidavit of Support claim for 2017 and 2018. Father asserts he could only be in breach of the agreement at the end of each year, because the trial court uses the annual income of the sponsored alien immigrant to determine whether he breached his obligations under the Affidavit of Support. He argues Mother should have brough forth new claims regarding Defendant's breach at the end of each year during the litigation.

¶ 22     Father also argues the trial court erred by considering the 125% of the Federal Poverty Level ("FPL") Guidelines values for a two-person household instead of a one-person household when determining whether Mother's annual income fell below the 125% FPL threshold. He similarly asserts the trial court erred by excluding certain tax-deductible depreciation expenses from mother's income when calculating damages. If those tax deductions were not excluded from Mother's income and the trial court applied the guidelines for a one-person household, Father argues he would

not owe Mother damages for breaching his contractual obligations under the USCIS Form I-864 Affidavit of Support.

¶ 23    The following chart compares the 125% FPL Guidelines for both household sizes for the years the trial court awarded Mother damages arising from Father's obligations under the Affidavit of Support. Although Mother also sought damages for 2015, the trial court did not award damages for that year because her income exceeded the FPL Guidelines for a two-person household in 2015.

| 125% of the Federal Poverty Level Guidelines (in USD) | | |
|---|---|---|
| **Year** | **One-Person Household** | **Two-Person Household** |
| 2016 | $ 14,850 | $ 20,025 |
| 2017 | $ 15,075 | $ 20,300 |
| 2018 | $ 15,175 | $ 20,575 |

¶ 24    Mother's adjusted gross income on her federal tax returns for the requisite years is displayed in the table below, along with Mother's income without deducting her depreciation expenses:

| Mother's Adjusted Gross Income | | Mother's Income Before Subtracting Depreciation Expenses | |
|---|---|---|---|
| Year | Amount in USD | Year | Amount in USD |
| 2016 | $ 8,511 | 2016 | $18,066 |
| 2017 | $ 7,173 | 2017 | $16,728 |
| 2018 | $ 6,703 | 2018 | $16,258 |

## A. Subject Matter Jurisdiction

Mother asserted a breach of contract claim in her First Amended Answer and Counterclaims, filed on 13 December 2016. Father argues the only possible year the trial court possessed subject matter jurisdiction over Mother's claim for damages arising from the Affidavit of Support was 2016, and he asserts the "threshold for determining liability under the Affidavit of Support is 125% of the [FPL], [which is] calculated on an annual level, rather than monthly [basis]." Mother renewed her claim in her Second Amended Answer and Counterclaims filed on 14 February 2017. Defendant asserts his potential liability for 2017 and 2018 was speculative, as 2017 had not ended when Mother renewed her claim and 2018 had not begun, making both claims premature and not "ripe."

### 1. Standard of Review

"Whether a trial court has subject-matter jurisdiction is a question of law, reviewed de novo on appeal." *McKoy v. McKoy*, 202 N.C. App. 509, 511, 689 S.E.2d

590, 592 (2010) (citation omitted). "Subject-matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it." *Id.* (citation and internal quotation marks omitted).

### 2. *Suozzo v. Suozzo*

The defendant in *Suozzo v. Suozzo* argued "the trial court erred by awarding damages for the monthly installments that became due only after Wife commenced th[e] action," because "[w]ife did not sue for claims which came due subsequent to the filing [of] the complaint." __ N.C. App. __, 2022-NCCOA-620, ¶ 10, 876 S.E.2d 915 (2022) (unpublished) (internal quotation marks and alterations omitted). This Court held the trial court did not err by awarding damages for monthly installments the defendant-husband had missed after wife had filed her complaint. *Id.* ¶ 13. Wife did not "limit her prayer for relief to the recovery of installments prior to the filing of her complaint" and she prayed for "'all damages incurred as a result of Defendant's breach' and for 'such other and further relief as the Court may deem just and proper.'" *Id.* ¶ 12.

Here, Mother was not required to renew her breach of contract claim arising under the USCIS Affidavit of Support at the end of each new year the litigation proceeded into, as she had prayed for all monetary damages resulting from Father's breach and "such other and further relief [as] the Court may deem just and proper." *Id.* ¶ 13.

¶ 29        North Carolina courts have jurisdiction to adjudicate breach of contract claims deriving from a supporting spouse's failure to comply with an Affidavit of Support. *See Zhu v. Deng,* 250 N.C. App. 803, 794 S.E.2d 808 (2016).  The trial court possessed subject-matter jurisdiction to hear and adjudicate Mother's claims under her prayer for relief for Father's breach as they accrued for the years 2017 and 2018.  Father's argument is overruled.

## B.  USCIS Form I-864 Affidavit of Support

### 1.  *Standard of Review*

¶ 30        The contents of a USCIS Form I-864 Affidavit of Support "are specified in 8 U.S.C. § 1183a, and . . . [are] [ ] an issue of statutory interpretation."  *Id.* at 817, 794 S.E.2d at 817 (citation omitted).  "Questions of statutory interpretation are questions of law, which are reviewed *de novo* by an appellate court."  *Martin v. N.C. Dep't. of Health & Human Servs.,* 194 N.C. App. 716, 719, 670 S.E.2d 629, 632 (2009) (citation and quotation marks omitted); *Anderson v. Anderson,* 840 F. App'x 92, 94 (9th Cir. 2020) (unpublished) (explaining that whether the court correctly instructed the jury they were allowed to consider TRICARE health insurance benefits and a judgment for attorney's fees as "income" should be reviewed *de novo,* not for an abuse of discretion, because the appellate court was determining "whether the challenged instruction correctly state[d] the law").

### 2.  *Analysis*

¶ 31    Federal statutes in the U.S. Code mandate compliance with certain immigration requirements before an alien from another country or jurisdiction may lawfully enter sovereign borders of the United States. A potential immigrant or "alien who . . . is likely at any time to become a public charge is inadmissible," and cannot lawfully enter, although if properly filed, "the consular officer or the Attorney General may also consider any [A]ffidavit of [S]upport under section 1183a of this title" before reaching a decision about whether to allow entry. 8 U.S.C. § 1182(a)(4)(A)-(B)(ii) (2018).

¶ 32    A United States citizen, or a "lawfully admitted" alien, may "sponsor" an immigrant or alien petitioning for admission and lawful entry into the United States by signing an Affidavit of Support USCIS Form I-864A contract and promising "to maintain the sponsored alien at an annual income that is not less than 125 percent of the [FPL]." 8 U.S.C. § 1183a(a)(1)(B), (f)(1) (2018).

¶ 33    "Form I-864A is considered a legally enforceable contract between the sponsor and the sponsored immigrant." *Zhu*, 250 N.C. App. at 807, 794 S.E.2d at 812 (citation and internal quotation marks omitted). The sponsoring spouse is, nevertheless, only obligated to pay the sponsored immigrant if the immigrant's income is less than 125% of the FPL for the requisite household size. 8 U.S.C. § 1183a(a)(1)(A); *Zhu*, 250 N.C. App. at 807, 794 S.E.2d at 812 (citation omitted); *Barnett v. Barnett*, 238 P.3d 594, 598-99 (Alaska 2010) (explaining "[e]xisting case law supports the conclusion that a

sponsor is required to pay only the difference between the sponsored non-citizen's income and the 125% of [FPL] threshold" and denying support for any amount above the 125% threshold because "the parties have referred us to no authority supporting the proposition that federal law requires a sponsor to pay spousal support when the sponsored non-citizen's earned income exceeds 125% of the [FPL]").

¶ 34    "The sponsor's obligation under the affidavit does not terminate in the event of divorce." *Id.* (citation and quotation marks omitted); *Erler v. Erler (Erler I)*, 824 F.3d 1173, 1177 (9th Cir. 2016) ("[U]nder federal law, neither a divorce judgment nor a premarital agreement may terminate an obligation of support."); *Wenfang Liu v. Mund*, 686 F.3d 418, 419-20 (7th Cir. 2012) (explaining the "right of support conferred by federal law exists apart from whatever rights [a sponsored alien] might or might not have under [state] divorce law").

¶ 35    In addition, "child support is a financial obligation to one's non-custodial child, not a monetary benefit to the other parent. . . . [C]hild support payments do not offset the defendant's obligation under the affidavit." *Younis v. Farooqi*, 597 F. Supp. 2d 552, 555 (D. Md. 2009).

### a. Household Size

¶ 36    The federal regulation defining the terms used in the USCIS Form I-864 Affidavit of Support provides: "Income means an individual's total income (adjusted gross income for those who file IRS Form 1040EZ) for purposes of the individual's

U.S. Federal income tax liability, including a joint income tax return[.]" 8 C.F.R. § 213a.1. This definition, however, only defines "income" for the supporting spouse, and not the dependent spouse intending to lawfully immigrate and enter. *See Flores v. Flores*, 590 F. Supp. 3d 1373, 1380 (W.D. Wash. 2022) (citation omitted) ("The Immigration and Nationality Act [ ] does not define income with respect to the sponsored immigrant.").

¶ 37        North Carolina's courts have never defined "income" for the purpose of determining what amount a supporting spouse is obligated to pay a dependent spouse, who they agreed to sponsor by signing an USCIS I-864 Affidavit of Support, and this issue is of first impression. The approaches other courts have taken, when resolving the issue of which household size may be considered to calculate damages, is persuasive guidance, although not binding. *N.C. Ins. Guar. Ass'n v. Weathersfield Mgmt.*, 268 N.C. App. 198, 203, 836 S.E.2d 754, 758 (2019) (citation omitted) ("When this Court reviews an issue of first impression, it is appropriate to look to decisions from other jurisdictions for persuasive guidance.").

¶ 38        In *Flores*, a couple were parents of three children: two children who "were born after Plaintiff immigrated to the United States and, therefore, are citizens of the United States," and one lawfully residing child who was a "citizen of the Philippines and Lawful Permanent Resident of the United States." *Flores*, 590 F. Supp. 3d at 1378 n.1. When the supporting spouse in *Florer* submitted the USCIS Form I-864

Affidavit of Support, only the first child, who was a citizen of the Philippines, was listed on the form along with the dependent spouse. *Id.* (citing *Erler I*, 824 F.3d at 1180).

¶ 39    The court in *Florer* held the supporting spouse only agreed to sponsor both the dependent spouse and their first child, per the terms of the contractual agreement in the Affidavit of Support. *Id.* The supporting spouse did not agree to sponsor the two children who were U.S. citizens. *Id.* The proper household size used to calculate the supporting spouse's obligation was two, not four. *Id.* (citing *Erler I*, 824 F.3d at 1180 ("If the sponsor agreed to support more than one immigrant, and those immigrants separate from the sponsor's household and continue to live together, then the sponsor must provide them with whatever support is necessary to maintain them at an annual income of at least 125% of the [FPL] guidelines for a household of a size that includes all the sponsored immigrants.")).

¶ 40    The reasoning in *Florer* is supported by two independent lines of reasoning. First, children who are U.S. citizens are not aliens capable of becoming a "public charge" under the immigration statutes. *See* 8 U.S.C. § 1182(a)(4) (explaining that an "alien who . . . is likely at any time to become a public charge is inadmissible") Second, given the contractual nature of the Affidavit of Support, the supporting spouse in *Florer* was only contractually obligated to support the dependent spouse and their first child because those two were the only dependent alien individuals

listed on the Affidavit of Support.  *Flores*, 590 F. Supp. 3d at 1378 n.1.

¶ 41        Defendant cannot be liable for contractual damages to support individuals not required to be listed, per federal immigration law, in the terms of the "contract."  *See Erler I*, 824 F.3d at 1179 (explaining that a "sponsor would not reasonably expect to have to support the immigrant *and* any others with whom she chooses to live," nor would "the U.S. Government, who is also a party to the contract created by the affidavit, . . . reasonably expect the sponsor to support any others with whom the immigrant might choose to live following [their] separation").

¶ 42        Here, Father only promised to support *Mother* in the Affidavit of Support, as she was the only *alien* intending to immigrate and enter the U.S.  Their child was born before Father signed the Affidavit of Support.  Father initially and knowingly omitted the child as an *immigrant* he intended to sponsor on the USCIS Form I-864, as his son is a U.S. citizen, to whom the Affidavit of Support *does not apply*.  The trial court erred by calculating the damages Defendant owed to Plaintiff using the FPL Guidelines for a two-person household.  *Flores*, 590 F. Supp. 3d at 1378 n.1.

¶ 43        Whether Father owes Mother child support for their son is a separate issue governed by *state* law.  Mother is not barred from bringing her action for temporary and permanent child support, as she had voluntarily dismissed those claims *without prejudice*.  *Wenfang Liu*, 686 F.3d at 419-20 ("The right of support conferred by *federal law exists apart from whatever right*s Liu might or might not have under *[state]*

*divorce law*.") (emphasis supplied). The trial court's order is affected by error on this issue and is reversed.

### b. *Sponsored Immigrant's Income*

¶ 44 Father also argues the trial court erred by using Mother's Adjusted Gross Income when determining whether Father owed Mother damages arising from breaching the Affidavit of Support. He asserts the trial court should have considered Mother's gross income, prior to deduction of certain depreciation expenses, instead of the adjusted gross income listed on her federal tax returns.

¶ 45 Federal law does not define how to calculate a sponsored immigrant's income. *Erler I*, 824 F.3d at 1177 ("[A]lthough several provisions of the statutes and the regulations contain instructions for calculating the sponsor's income and household size for purposes of determining whether the sponsor has the means to support the intending immigrant, *see* 11 U.S.C. § 1183a(f)(6)(A)(iii); 8 C.F.R. § 213a.1 (defining 'household income,' 'household size,' and 'income'); 8 C.F.R. § 213a.2(c)(2), there are no similar provisions for calculating the sponsored immigrant's income and household size for purposes of determining whether the sponsor has breached his or her duty to support the immigrant.").

¶ 46 Other courts, which have addressed whether the inclusion or exclusion of certain benefits, awards, grants, supplements, gifts, or agreements should be considered as part of the sponsored immigrant's "income," provide guiding principles.

One court held educational grants should be treated as income because they offset the living expenses of a sponsored immigrant. *Anderson,* 840 F. App'x at 95 ("The [ ] inclusion of "educational grants received by plaintiff" [as income] was not erroneous. To the extent [immigrant]'s educational grant covered her tuition and did not require repayment, it was income because it allowed her to put money she would otherwise use for tuition to other uses.").

¶ 47        Other courts have not considered public benefits for U. S. citizens, such as food stamps, as income, reasoning: (1) "[f]ood stamps contribute to keeping an individual above 125% of the [FPL] Guidelines, and the Affidavit's stated goal is to keep people from being public charges"; and, (2) the only reason the Internal Revenue Service (IRS) fails to tax food stamps is because "it makes little sense for the government to award a public benefit to an individual and then tax the individual on it." *Erler v. Erler (Erler II)*, 2017 WL 5478560, *6 (N.D. Cal. Nov. 15, 2017), *aff'd,* 798 F. App'x 150 (9th Cir. 2020) (unpublished).

¶ 48        Apart from the treatment of food stamps and educational grants, most courts have not considered other gifts, supplements, agreements, judgments, and benefits as part of a sponsored immigrant's income. For example, an informal agreement of board for work between a mother and son, where the mother agreed to perform certain housekeeping duties in exchange for living with her son, was not counted in a sponsored immigrant's income. *Id.* at *6 ("[Mother] never contracted with her son

to provide domestic housework in exchange for rent coverage. The rent she is allegedly responsible for covering is not income under 8 U.S.C. § 1183a.") (citation omitted). Without a formal contract or agreement, it is difficult to "appraise[ ] [an immigrant's] domestic work," nor does such an agreement increase an immigrant's cash flow. *Id.* (citation omitted).

¶ 49 The court in *Erler II* also held a divorce judgment, which is owed to the sponsoring spouse and never collected, does not constitute income for two reasons. *Id.* at *5. First, a divorce judgment "relates to the division of the couple's assets," is "not relevant," and "does not qualify as income." *Id.* (citation omitted). Second, if a sponsoring spouse "desires to collect his [or her] [ ] judgment against [sponsored immigrant], he [or she] can take this matter up with [the respective] Family Court." *Id.*

¶ 50 The U. S. Court of Appeals in *Anderson* explained the district court erred by "defining income as 'constructively-received income,'" and thus "permit[ing] the inclusion of TRICARE benefits as part of [sponsored immigrant's] income." *Anderson*, 840 F. App'x at 95 ("The health insurance benefits [sponsored immigrant] received through [sponsoring spouse's] TRICARE coverage were not income because [sponsoring spouse] did not pay an enrollment fee[,] and he should not receive a windfall at [sponsored immigrant]'s expense.") (citing *Erler I*, 824 F.3d at 1179). Health insurance coverage extended via marriage is different than other means-

tested benefits, such as food stamps, "because the state providing the benefits could seek reimbursement from the sponsor." *Id.* at 95 n.3.

The Alaska Supreme Court simplified the analysis by using the income reported on a sponsored immigrant's tax form in *Villars v. Villars*:

> [A]n EITC, [Earned Income Tax Credit], is not income for federal income tax purposes. The Internal Revenue Code defines "taxable income" as "gross income minus deductions." *See* 26 U.S.C. § 63(a) (2018) Gross income is defined as "all income from whatever source derived," *see id.* § 61(a), but the Code specifically excludes certain items from the definition, *see id.* §§ 101–40 ("Items Specifically Excluded from Gross Income"), including tax credits. *See Id.* § 111. Therefore, an EITC, which is by definition a tax credit, is not "income for purposes of the individual's U.S. Federal income tax liability" and cannot be used to offset [supporting spouse]'s I–864 obligations. The superior court did not err in concluding that any EITC [sponsored immigrant] received was not income.

336 P.3d 701, 712-13 (Alaska 2014) (alterations omitted).

Here, Mother entered evidence demonstrating the costs and expenses she had incurred to repair one of the properties she owned. Those costs were then deducted from her gross income on her U.S. federal tax returns. The trial court did not err as a matter of law by deducting these expenses when calculating Mother's income. *See Id.*; *Erler II.* at *5-6; *Anderson*, 840 F. App'x at 95.

**V.     Mother's Loan to Father to Finance the Property in Suwanee, Georgia**

Father asserts the trial court erred by finding a quasi-contract existed and

awarding Mother equitable damages resulting from his failure to repay Mother for a loan. Father argues the trial court should have found an implied-in-fact contract existed and, as a result, fashioned a remedy stemming from a breach of contract.

¶ 54      If this Court were to hold the trial court properly found a quasi-contract existed, Father argues the trial court abused its discretion in fashioning an equitable remedy by failing to credit Father for his "sweat equity" in repairing some of Mother's other properties in Australia.

## A. Quasi-Contract

¶ 55      An appellate court must have jurisdiction to consider an argument on appeal. *See Tohato, Inc. v. Pinewild Mgmt.*, 128 N.C. App. 386, 390, 496 S.E.2d 800, 803 (1998) (citation omitted) (explaining an appellate court may not reach a conclusion on issues that were not raised at trial); *State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (explaining that "where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount") (citations and internal quotation marks omitted).

¶ 56      In Father's response to Mother's Second Amended Answer and Counterclaims in August 2017, Father twice denied a loan existed. He first "explicitly denie[d]" Mother's assertion that "any note or other writing evidencing a loan from Mother to Father" existed. Later, he asserted "Mother never explicitly requested that [he] repay the money."

¶ 57    At trial in 2019, Father's counsel stated in closing arguments: "[T]he problem here is the [c]ourt is going to enter a judgment. And I think, analytically, these facts as they have come out, I think it's a quasi-contract." On appeal, Father now asserts the "evidence presented at trial[ ] tended to show the existence of a *contract* between the parties for the loan of $110,000 AUD," not a quasi-contract.

¶ 58    Father's argument on appeal about whether a quasi-contract or implied-in-fact contract existed is not properly preserved for this Court on appeal. Father cannot "swap horses" on appeal, and his argument is waived. *Tohato*, 128 N.C. App. at 390, 496 S.E.2d at 803; *Sharpe*, 344 N.C. at 194, 473 S.E.2d at 5; *accord Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934) ("[T]he law does not permit parties to swap horses between courts in order get a better mount[.]").

## B. Award of Equitable Damages

### 1. Standard of Review

¶ 59    This Court reviews unjust enrichment awards under an abuse of discretion standard "[b]ecause the fashioning of equitable remedies is a discretionary matter for the trial court." *Kinlaw v. Harris*, 364 N.C. 528, 533, 702 S.E.2d 294, 297 (2010) (citation omitted).

### 2. Unjust Enrichment

¶ 60    "Unjust enrichment is an equitable doctrine[,]" and "[t]rial courts have the discretionary power to grant, deny, limit, or shape equitable relief as they deem just."

*Bartlett Milling Co. v. Walnut Grove Auction & Realty*, 192 N.C. App. 74, 80, 665 S.E.2d 478, 485 (2008) (citations and internal quotation marks omitted).

¶ 61        The equitable relief the trial court awarded to Mother related to the trial court's finding and conclusion that a quasi-contract existed to finance an income-producing property located in Suwanee, Georgia, not any of Mother's or Father's other properties located elsewhere.  The trial court did not abuse its discretion by not crediting Father with any purported "sweat equity" he put into repairing some of Mother's other properties located in Australia.  *Bartlett Milling Co.*, 192 N.C. App. at 80, 665 S.E.2d at 485.  The trial court similarly declined to credit Mother with the "sweat equity" she purportedly put into repairing their residential property in Charlotte.  Father's argument is without merit.

## C. Currency for Payment of Damages

¶ 62        Father also argues the trial court erred by awarding Mother repayment of the loan in USD instead of AUD.  Mother argues Father wishes to pay Mother back in Australian funds on today's exchange rate because the exchange rate is currently lower than when Father originally converted the money to USD.

### *1. Standard of Review*

¶ 63        "The determination of the proper money of the claim pursuant to G.S. 1C-1823 is a question of law." N.C. Gen. Stat. § 1C-1825(d) (2021).  This Court reviews questions of law *de novo*.  *Martin*, 194 N.C. App. at 719, 670 S.E.2d at 632 (citation

omitted).

## 2. *Foreign-Money Claims Act*

¶ 64       The North Carolina Foreign-Money Claims Act provides "rules to fill gaps in

the agreement of the parties with rules as to the allocation of risks of fluctuations in

exchange rates." N.C. Gen. Stat. § 1C-1823(b), cmt. 2 (2021). Those rules are as

follows:

> (b) If the parties to a transaction have not otherwise
> agreed, the proper money of the claim, as in each case may
> be appropriate, is *the money*:
>
> > (1) Regularly *used between the parties* as a matter of
> > usage or course of dealing;
> >
> > (2) Used *at the time of a transaction* in international
> > trade, by trade usage or common practice, for
> > valuing or settling transactions in the particular
> > commodity or service involved; or
> >
> > (3) In which the loss was ultimately felt or will be
> > incurred by the party claimant.

*Id.* § 1C-1823(b) (emphasis supplied). The three rules in subpart b "will normally

apply in the order stated," but the "[a]ppropriateness of a rule is to be determined by

the judge from the facts of the case." *Id.* § 1C-1823(b) cmt. 2.

¶ 65       The evidence at trial indicated Father "[r]egularly used" AUD to pay Mother

for the interest accruing on her Australian line of credit. § 1C-1823(b)(1). Second,

AUD were "[u]sed at the time of the transaction." § 1C-1823(b)(2). Finally, Mother's

loss was "ultimately felt" or "incurred" in AUD. N.C. Gen. Stat. § 1C-1823(b)(3)
(2021).

¶ 66    "If [ ] the contract fails to provide a decisive interpretation, the damage should
be calculated in the currency in which the loss was felt by the plaintiff or which most
truly expresses his loss." *M.V. Eleftherotria v. Owner of M.V. Despina R*, [1979] App.
Cas. 685, 701 (internal quotation marks omitted) (cited favorably by N.C. Gen. Stat.
§ 1C-1823(b), cmt. 2).

¶ 67    Applying the rules in the "order stated," all three prongs of § 1C-1823(b) dictate
Mother's equitable relief should have been awarded and paid in AUD, not USD. The
trial court erred as a matter of law by awarding Mother equitable relief payable in
USD and its order on this issue is reversed in part. On remand, the trial court is to
correct and convert Mother's equitable award and any interest thereon as re-payable
in AUD for any outstanding balance.

## VI.    Additional Hearing Before Entry of the Order

¶ 68    After the hearing in December 2019, Mother's attorney initially drafted a
proposed order in this case. Father's attorney revised Mother's initial draft, and the
two subsequently exchanged various versions of the proposed judgment. Mother and
Father did not reach an agreement concerning the final version to present to the trial
court to sign, file, and enter. As a result, the trial court held an additional conference
on 9 February 2021. Father argues Mother "improperly reargued the merits of the

case and submitted additional evidentiary information" at this conference.

¶ 69 Father asserts Mother's proposed judgment, circulated after the conference, "improperly altered the Order such that the substantive rights of the parties were changed." Father and Mother again submitted additional drafts and exchanged several electronic communications regarding remaining issues before the court entered a final order on 7 June 2021, over *eighteen months after* the hearing and oral rendition in December 2019. Father argues Mother "improperly attempted and succeeded at a back-door Rule 60 [of the North Carolina Rules of Civil Procedure] argument."

¶ 70 This over *eighteen months* delay in entry of the order following hearing and rendition is unexplained in the order, and this delay also impeded the appeal and appellate review of the trial judge's holdings and conclusions. The mission of the North Carolina Judicial Branch is "to protect and preserve the rights and liberties of all the people, as guaranteed by the Constitution and laws of the United States and North Carolina, by providing a fair, independent, and accessible forum for the *just, timely, and economical resolution of their disputes.*" *About North Carolina Courts*, North Carolina Judicial Branch, http://www.nccourts.gov/about/about-the-north-carolina-judicial-branch (last visited Jan. 4, 2022) (emphasis supplied); *see also* Cannon 3 of the North Carolina Code of Judicial Conduct ("A judge should perform the duties of the judge's office impartially and *diligently*. The judicial duties of a

judge take *precedence* over all the judge's other activities. The judge's judicial duties include all the duties of the judge's office prescribed by law. In the *performance of these duties*, the following standards apply. . . . (5) A judge should *dispose promptly* of the business of the court.") (emphasis supplied).

¶ 71 Father cites *Buncombe County ex rel Andres v. Newburn*, which explains "Rule 60(a) allows the correction of clerical errors, but it does not permit the correction of serious or substantial errors." 111 N.C. App. 822, 825, 433 S.E.2d 782, 784 (1993) (citation omitted) (explaining the purpose of N.C. Gen. Stat. § 1A–1, Rule 60(a) (2021)). Father also acknowledges: "The general rule is that it is in the discretion of the trial judge whether to allow additional evidence by a party after that party has rested or whether to allow additional evidence after the close of the evidence." *Gay v. Walter*, 58 N.C. App. 360, 363, 283 S.E.2d 797, 799 (1981) (citations omitted).

¶ 72 The additional conference held regarding the final form of the order to be entered occurred *before* the trial judge had entered the final order. Rule 60(a) only applies to changes made to a final order. Trial judges may exercise discretion about whether to hold a conference after the close of the evidence and before the final order is filed and entered. *Id.* While Father has failed to show the trial court violated N.C. R. Civ. P. 60(a), the long year and one-half delay in entry and, consequently appellate review, did not further nor promote "the *just, timely, and economical resolution of their disputes*."

### VII.    Unavailability of Portions of the Trial Transcript

"The unavailability of a verbatim transcript does not automatically constitute error.  To prevail on such grounds, a party must demonstrate that the missing recorded evidence resulted in prejudice." *State v. Quick,* 179 N.C. App. 647, 651, 634 S.E.2d 915, 918 (2006) (citations omitted).  "Overall, a record must have the evidence necessary for an understanding of all errors assigned." *Madar v. Madar*, 275 N.C. App. 600, 608, 853 S.E.2d 916, 922 (2020) (quotation marks omitted) (quoting *Quick*, 179 N.C. App. at 651, 634 S.E.2d at 918).

Father does not show how the missing portions of the transcript prejudiced him on appeal.  *Quick*, 179 N.C. App. at 651, 634 S.E.2d at 918.  Sufficient portions of the transcript exist for this Court to understand the errors Father argued and assigned to the trial court and the order eventually entered.  The existing record allowed Father to adequately present and argue this appeal.  He has successfully argued several issues and errors before this Court.  Father has failed to show any prejudice by the missing portions of the trial transcript.

### VIII.    Attorney's Fees

"Remedies available to enforce an affidavit of support under this section include . . . an order for specific performance and payment of legal fees and other costs of collection[.]"  8 U.S.C. § 1183a(c).  The USCIS Form I-864 Affidavit of Support, which Father signed, also provides notice to sponsoring spouses: "If you are sued, and

the court enters a judgment against you, the person or agency who sued you may use any legally permitted procedures for enforcing or collecting the judgment. You may also be required to pay the costs of collection, including attorney fees."

¶ 76    While the trial court should have calculated Mother's damages using a household size of one, and is ordered to do so upon remand, Father still breached his obligations to support Mother under the Affidavit of Support for 2016, 2017, and 2018. Mother was a prevailing party on her claim, and she may recover reasonable attorney's fees. *Iannuzzelli v. Lovett*, 981 So.2d 557, 560-61 (Fla. Dist. Ct. App. 2008) ("In order to recover attorney's fees and costs under 8 U.S.C. § 1183a(c), the claimant must obtain a judgment for actual damages based upon the opposing party's liability under the Affidavit."). The trial court did not err by awarding Mother's attorney's fees. In light of the errors Father successfully argued and prevailed in, regarding the reduction of the amounts owed under the USCIS Form I-864 herein, the trial court may in its discretion re-consider the amount previously awarded upon remand using the elements and guidance stated in N.C. Rev. R. Prof. Conduct 1.5.

## IX.    Conclusion

¶ 77    The trial court possessed subject matter jurisdiction to hear Mother's claims for Father's breach under the USCIS Form I-864 Affidavit of Support. The trial court erred by calculating the damages Defendant owed to Plaintiff using the 125% of FPL Guidelines for a two-person household. *See Flores*, 590 F. Supp. 3d at 1378 n.1. The

amounts entered at trial on this issue are vacated.   On remand, the trial court should

calculate Mother's damages arising from the Affidavit of Support as follows:

| Year | 125% FPL Guidelines for a One-Person Household (USD) | Mother's Adjusted Gross Income (USD) | Mother's Damages (USD) |
|---|---|---|---|
| 2016 | $ 14,850 | $ 8,511 | $14,850 - $8,511 = $6,339 |
| 2017 | $ 15,075 | $ 7,173 | $15,075 - $7,173 = $7,902 |
| 2018 | $ 15,175 | $ 6,703 | $15,175 - $6,703 = $8,472 |

¶ 78        The trial court did not err as a matter of law by failing to add depreciation

expenses Mother lawfully deducted from her adjusted gross income on her federal tax

returns back into her "income" when calculating damages under the Affidavit of

Support.  *See Villars*, 336 P.3d at 712-13; *Erler II* at *5-6; *Anderson*, 840 F. App'x at

95.

¶ 79        Father failed to preserve his argument about whether an express, quasi-

contract, or implied-in-fact contract for debt repayment existed on appeal, because he

offered contradictory arguments at trial.  *See Tohato*, 128 N.C. App. at 390, 496

S.E.2d at 803; *Sharpe,* 344 N.C. at 194, 473 S.E.2d at 5; *Weil*, 207 N.C. at 10, 175 S.E.

at 838.

¶ 80        The trial court did not abuse its discretion when fashioning an equitable

remedy by failing to credit Mother or Father with any purported "sweat equity" either may have exerted into repairing other properties. The loan proceeds from Mother were used to purchase the income-producing property located in Suwanee, Georgia, which was sold by Father without repayment of Mother's loan from the proceeds. *Bartlett Milling Co.*, 192 N.C. App. at 80, 665 S.E.2d at 485.

¶ 81 Mother loaned and paid Father in AUD, and Father re-paid the interest in AUD. Mother's loss occurred in AUD, and her re-payment and interest to her bank's line of credit is payable in AUD. Father received loan proceeds in AUD and took the risk of conversion rate to USD after receipt.

¶ 82 The trial court erred as a matter of law by awarding mother equitable relief payable in USD instead of AUD. *See* N.C. Gen. Stat. § 1C-1823(b); *The Despina R*, [1979] App. Cas. 685, 701 (internal quotation marks omitted). On remand, the trial court is to correct and convert Mother's equitable award from the loan amount and any interest due from USD into AUD, with credit for payments Father made.

¶ 83 Trial judges are granted discretion about whether to hold a conference after the close of the evidence. *Gay*, 58 N.C. App. at 363, 283 S.E.2d at 799. The missing portions of the transcript were not shown to have prejudiced Father, as Father successfully argued several issues of error on appeal. *Quick*, 179 N.C. App. at 651, 634 S.E.2d at 918.

¶ 84 The trial court did not err by awarding Mother reasonable attorney's fees

arising from her claims for breach of the USCIS I-864 Form Affidavit of Support, because Mother prevailed on her claim, subject to any adjustments noted above upon remand. *Iannuzzelli*, 981 So.2d at 560-61. The order appealed from is affirmed in part, reversed in part, and is remanded for further proceedings not inconsistent with this opinion. *It is so ordered*.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges CARPENTER and GRIFFIN concur.